Filed 12/31/25  P. v. Pressley CA4/1
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GREGORY SCOTT PRESSLEY,<br><br>    Defendant and Appellant. | D084686<br><br><br><br>(Super. Ct. No. SCE424322) |

APPEAL from a judgment of the Superior Court of San Diego County, Patricia K. Cookson, Judge.  Affirmed.

Annie Fraser, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

## I.  INTRODUCTION

A deputy sheriff conducted a traffic stop from which the driver fled. The deputy found a loaded revolver under the driver's seat of the suspect's

van.  Portions of the events were captured on video.  At trial the deputy, and a detective later assigned to the case, both identified defendant Gregory Pressley as the fleeing driver.  The jury found Pressley guilty of possession of a firearm by a felon (Pen. Code,[1] § 29800, subd. (a)(1)) and possession of ammunition by a prohibited person (§ 30305, subd. (a)(1)).  The trial court placed Pressley on probation for two years.  Pressley raises two issues on appeal.

First, Pressley contends the trial court erred by allowing the deputy and detective to identify him because they lacked personal knowledge of his appearance.  We find no error as to the deputy (who saw the suspect fleeing firsthand) and conclude any assumed error as to the detective (who saw the suspect only on video and in photos) was harmless.

Second, Pressley argues the prosecutor erred by commenting during voir dire on the prospect that Pressley would not testify at trial.  (See *Griffin v. California* (1965) 380 U.S. 609, 615 (*Griffin*).)  We agree the prosecutor committed *Griffin* error but conclude it was harmless.

Finding no cumulative error from the assumed evidentiary error and the *Griffin* error, we affirm the judgment.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

Around 9:55 a.m. on April 13, 2023, San Diego County Deputy Sheriff John Balos was patrolling traffic on his marked motorcycle when he saw a

---

1    Statutory references are to the Penal Code unless otherwise indicated.

white van run a stop sign.[2]  The deputy activated his emergency lights and siren.  The van, after initially failing to yield, eventually stopped in an AM/PM gas station parking lot.  Deputy Balos approached the van and saw in the "shattered" passenger's side mirror that the driver appeared to be Black and possibly male.  As the deputy moved to the driver's side to contact the driver, a Black male exited the driver's seat and began walking away.  Deputy Balos announced loudly, "Stop, sheriff's department," but the suspect ran away.

As the suspect ran away, he looked back over his left shoulder.  From about 30 feet away, Deputy Balos saw "a portion of the left side of [the suspect's] face and a portion of . . . the left front side of his face."  Concerned someone else was in the van, the deputy stayed by it and radioed for backup to pursue the fleeing suspect.  Deputy Balos described the suspect over the radio as a Black male, about 30 years old, six feet tall, and weighing about 130 pounds with a thin build.  At trial, the deputy added that the suspect had shoulder-length dreadlocks and was wearing a black baseball cap.

Deputy Balos saw security cameras mounted near the roof of the AM/PM and obtained video footage of the incident from them.  The footage was shown to the jury.  It shows a tall, thin Black male with a baseball cap exit the van and begin walking away (with no discernable limp) before eventually running.

After determining the van's registration expired in 2020, Deputy Balos conducted an inventory search before having the van towed.  After finding

---

2    Before Deputy Balos testified, the trial court read the following stipulation to the jury regarding the deputy's credibility:  "On October 13th, 2016, Deputy John Balos was disciplined for unbecoming conduct and neglect of duty for partaking in activities not required in the performance of the [*sic*] duty."

nothing notable during a preliminary search, the deputy eventually found a body armor vest behind the driver's seat and a revolver loaded with three rounds concealed under the driver's seat. It appears from body-worn camera footage of the preliminary search that Deputy Balos was not wearing gloves during the search; photos of the revolver show him wearing a leather motorcycle glove while holding the gun. The deputy determined the revolver was functional and submitted it for forensic analysis.

Deputy Balos provided information about the van's registration to the dispatcher, who advised that there was a "pending master file" identifying Gregory Pressley as attempting to register it.[3] The most recent DMV records showed it was registered to Russell T. at a specific address on Lamar Street. Records showed that Pressley also lived at that same address. Pressley and Russell were the only males associated with that address in the three-year period preceding trial.

To determine whether it was Pressley or Russell who fled from Deputy Balos, investigators reviewed DMV records and body-worn camera footage pertaining to each male.

Pressley's driver's license from July 2022 listed his height as 6 feet 6 inches tall, his weight as 185 pounds, and showed his hair was shoulder-length dreadlocks tied back to one side. The trial court took judicial notice that Pressley was 6 feet 7 inches tall when wearing inch-and-a-half tall shoes.

Deputy Sheriff Raymond Guzman testified about an encounter with Pressley on August 16, 2022, that was captured on body-worn camera

---

[3]    This information was not admitted for its truth because the prosecutor did not obtain certified DMV records. The evidence was therefore admitted only to explain Deputy Balos's subsequent conduct and investigation.

footage. The prosecutor played the footage (without audio) for the jury. The recording showed that Deputy Guzman responded to Lamar Street and met Pressley near a white van. Pressley told the deputy he had slept in the back of his van the night before. The deputy described Pressley's height as 6 feet 3 or 4 inches tall (and definitely no taller than 6 feet 8 inches), his weight as about 170 pounds with a thin build, and his hair as tied-back braids or dreadlocks.

Deputy Sheriff Jian Laxina testified about an encounter with Pressley on November 11, 2022, that was captured on body-worn camera footage, which the prosecutor also played for the jury without audio. Deputy Laxina told jurors he responded to the Lamar Street address, saw a white van parked across the street, and was directed to the residence's garage where he found Pressley sleeping. Deputy Laxina testified Pressley's hair was braided and in a ponytail.

Deputy Sheriff Kerry Hughes testified about an encounter with Pressley on May 20, 2023, that was captured on body-worn camera and played for the jury without audio. In that instance, Deputy Balos and Deputy Hughes responded to a report by Pressley that his Mercedes had been vandalized. Deputy Hughes interviewed Pressley. Pressley stated he got the Mercedes about a month earlier (that is, about a week after the van was towed from the crime scene). Deputy Hughes testified Pressley was about 6 feet 4 inches tall, with "a dreaded hairstyle." Deputy Balos testified that "the person who reported [the vandalism] looked familiar," but the deputy did not question Pressley then about the van incident.

Turning our attention to the other resident, Russell T., DMV records showed that he was 6 feet 1 inch tall, weighed 222 pounds, and wore his hair in a "fohawk" — "kind of like a mohawk and a short tapered haircut along the

5

side." Photos of Russell posted to his social media accounts in March 2022 showed "an extremely short hairstyle." Body-worn camera footage from an August 29, 2023, encounter with Russell showed that he walked with "a distinct limp," had a medium build with a "somewhat protruding" stomach, and had "short . . . Afro-style hair." This footage was played for the jury.

Deputy Balos testified about his role in the investigation. After the deputy wrote his report in April 2023, the case was assigned to a detective. The detective "bounced things off" Deputy Balos and they "went back and forth as far as trying to figure out how to identify" the suspect from the incident. In July 2023, Deputy Balos was assigned to "kind of take [the investigation] back over." In doing so, he looked at three or four incidents in which Pressley was connected to the van and compared images from the AM/PM security footage with images of Pressley and Russell. "Based on the totality of the circumstances," Deputy Balos testified he "had reason to believe" that Pressley was the person "who . . . fled the scene" in April 2023.

Sheriff's detective Andrew Paulino also testified about his involvement in this case. The detective testified he became involved in the case about one month before trial. He had never met Pressley, seen the van, nor been to the Lamar Street location. Detective Paulino read Deputy Balos's report; watched the AM/PM surveillance footage "multiple times"; watched some of the body-worn camera footage discussed above as well as footage of another encounter with Pressley on August 30, 2022, which was played for the jury; watched body-worn camera footage of an encounter with Russell; looked at DMV records and social media images of Russell; and reviewed registration records for the van. "Based on the photos, all prior contacts, the build of . . . Russell, and the way the subject moves away from the scene" in the "AM/PM surveillance" footage, Detective Paulino concluded "the subject was not . . .

6

Russell." Instead, "based on all prior contacts" and "documented photos," Detective Paulino "believed the subject who ran from Deputy Balos at the time was Mr. Pressley."

A crime lab technician analyzed the revolver for latent fingerprints and found none. A DNA analyst determined the gun contained a mixture of DNA from two contributors, one a 96-percent contributor and the other a 4-percent contributor. The analyst also examined a reference DNA sample obtained from Pressley's inner cheek.[4] The analyst determined that Pressley best fit the 96-percent contributor, with a 400 quintillion likelihood ratio.

The only evidence Pressley presented at trial was the trial court's judicial notice of his height. He otherwise relied on an identity defense and held the prosecution to its burden of proof.

The parties stipulated that Pressley suffered a prior felony conviction.

### B. Procedural Background

The prosecution charged Pressley with felony counts of possession of a firearm by a felon (§ 29800, subd. (a)(1)) and possession of ammunition by a prohibited person (§ 30305, subd. (a)(1)), and one misdemeanor count of resisting arrest (§ 148, subd. (a)(1)).

---

[4] The defense insinuated that the reference DNA sample from Pressley was contaminated. Deputy Balos obtained the reference sample from Pressley at an earlier hearing by swabbing Pressley's inner cheek. At trial, the deputy acknowledged he did not wash his hands or put on gloves before beginning to obtain the sample. After defense counsel reminded Deputy Balos to put on gloves, he put on only one glove because there was only one glove in the DNA kit. The DNA analyst refuted the defense's contamination theory. The analyst confirmed there was only one contributor to the reference sample. And she clarified that if someone touched the tip of a swab that had collected a reference sample from an inner cheek, she "would never expect to be able to detect any" DNA from "a brief contact" by the toucher because inner cheeks "have a lot of DNA in them."

The jury found Pressley guilty of the firearm and ammunition possession charges and not guilty of resisting arrest.

The trial court placed Pressley on probation for two years on the firearm charge and gave him credit for time served on the ammunition charge.

## III. DISCUSSION

### A. Admission of Lay Opinion Regarding Identity

Pressley contends the trial court erred by allowing Deputy Balos to testify he determined it was Pressley "who . . . fled the scene" and by permitting Detective Paulino to testify he believed it was Pressley "who . . . is depicted in th[e] surveillance video." We find no error as to Deputy Balos and conclude any assumed error as to Detective Paulino was harmless.

#### 1. Background

Pressley moved in limine to preclude Detective Paulino from testifying that he determined Pressley was the driver of the van. Pressley argued that because Detective Paulino was not present during the incident, his conclusions about the significance of the evidence would "dilute[]" the jury's "decision-making power." Instead, Pressley reasoned, the court should "let the jury look at the same evidence that Detective Paulino looked at" and "reach their own conclusions" — "If the evidence was good enough for Detective Paulino's eyes, it should be good enough for the jury's eyes." The motion did not address Deputy Balos.

The trial court denied the motion, explaining that the detective's "elimination or . . . inclusion of someone based upon hairstyle, manner of walking, . . . clothing, and color of the skin" is "relevant evidence."

8

At trial, Deputy Balos testified as follows about his conclusion regarding the identity of the suspect who fled from him:

> Q. And based on reviewing all of those photos [of Pressley and Russell] and the surveillance and your follow-up investigation, were you able to determine who it was that fled the scene that day?
>
> A. So, yes. Based on the totality of the circumstances, I had reason to believe it was Gregory Pressley.

Pressley did not object.

The prosecutor also questioned Detective Paulino about his conclusions regarding the identity of the suspect in the AM/PM surveillance video. In one instance, the prosecutor asked, "Who do you believe is depicted in this surveillance video?" Detective Paulino responded, "Based on the build and the facial hair . . . I believe it would be Mr. Pressley." The prosecutor then questioned Detective Paulino as follows about his conclusions regarding whether the suspect was Pressley or Russell:

> Q. Based on this investigation, did you rule out that [Russell] could have been the person who fled the scene that day?
>
> A. Based on the photos, all prior contacts, the build of [Russell], and the way the subject moves away from the scene that you're looking at with the AM/PM surveillance, I believed the subject was not [Russell].
>
> Q. And did you believe that it was the defendant?
>
> A. Based on all prior contacts, documented photos, I believed the subject who ran from Deputy Balos at the time was Mr. Pressley.

9

## 2.  Relevant Legal Principles

"A lay witness may offer opinion testimony if it is rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony.  (Evid. Code, § 800.)  '[T]he identity of a person is a proper subject of nonexpert opinion.' " (*People v. Leon* (2015) 61 Cal.4th 569, 601 (*Leon*).)  "Court of Appeal decisions have long upheld admission of testimony identifying defendants in surveillance footage or photographs."  (*Ibid.*)  We review the trial court's ruling for an abuse of discretion.  (*Id.* at p. 600.)

"Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional [*People v. Watson* (1956) 46 Cal.2d 818] test:  The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error."  (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

## 3.  Analysis

We address Pressley's claims as to Deputy Balos and Detective Paulino separately because they are materially distinguishable — Deputy Balos had personal knowledge of Pressley's appearance apart from the surveillance footage whereas Detective Paulino did not.

The trial court acted within its discretion in allowing Deputy Balos to testify that Pressley was the person who ran away from him.[5] The deputy testified he saw Pressley during the traffic stop and got a partial look at Pressley's face. Deputy Balos also testified that Pressley looked familiar when the deputy saw him about a month later when responding to Pressley's vandalism report. It is sufficient that Deputy Balos became "familiar with [Pressley]'s appearance *around the time of the crimes*" — it is immaterial that the deputy "did not have contact with him *before* the crimes." (*Leon, supra,* 61 Cal.4th at p. 601, italics added.) Although Deputy Balos's contemporaneous description of Pressley's height and weight may not have been accurate, "[q]uestions about the extent of [a witness]'s familiarity with [the] defendant's appearance [go] to the weight, not the admissibility, of his testimony." (*Ibid.*; see *People v. Gonzales* (1968) 68 Cal.2d 467, 472 [where a police officer's testimony identifying the suspect at the crime scene was based on "clothing and specified characteristics of the man" but not "facial characteristics," any "[l]ack of positiveness as to the man's identity went to the weight and not to the competency of the evidence"].) "Moreover, because the surveillance video was played for the jury, jurors could make up their own minds about whether" Deputy Balos accurately identified Pressley.

---

[5] The Attorney General argues Pressley forfeited his challenge as to Deputy Balos because Pressley objected in the trial court only as to Detective Paulino. We will exercise our discretion to consider this issue on the merits. (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 ["An appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party."].) For the same reasons, we reject Pressley's argument in reply that the Attorney General's failure to address the merits as to Deputy Balos concedes the issue. As the appellant, it is Pressley's burden to demonstrate error. (See *People v. Gonzalez* (2021) 12 Cal.5th 367, 409.)

(*Leon*, at p. 601.)  Accordingly, the trial court acted within its discretion in allowing Deputy Balos to identify Pressley as the suspect who ran from him.

Detective Paulino presents a different situation because his familiarity with Pressley came entirely from the materials reviewed in the investigation. Courts of Appeal have reached different conclusions about the admissibility of lay opinions regarding identity in this situation.  Some cases hold that a witness must have some degree of personal knowledge of a suspect before the witness may purport to identify that individual in a photograph.  (See, e.g., *People v. Perry* (1976) 60 Cal.App.3d 608, 613 [witnesses' identification testimony was admissible where it was based on their "prior contacts with [the] defendant" and "their awareness of his physical characteristics on the day of the" crime and was helpful to the jury because the defendant had "altered his appearance" before trial]; *People v. Mixon* (1982) 129 Cal.App.3d 118, 128 [observing that "*Perry* . . . requires two predicates for the admissibility of lay opinion testimony as to the identity of persons depicted in surveillance photographs:  (1) that the witness testify from personal knowledge of the defendant's appearance at or before the time the photo was taken; and (2) that the testimony aid the trier of fact in determining the crucial identity issue" either because the defendant's appearance has changed or because the photo did not clearly depict the defendant].)

On the other hand, recent cases have allowed witnesses without personal knowledge of a suspect to identify that party in a video where the witness otherwise had a sound foundation regarding the person's identity and could assist the jury in some way beyond merely identifying the suspect. (See, e.g., *People v. Larkins* (2011) 199 Cal.App.4th 1059, 1067, 1068 (*Larkins*) [finding no error in admitting a non-police witness's identification testimony where his foundation was based on viewing two photos that

12

undisputedly depicted the defendant; the identification was based on the witness viewing 20 or 30 *videos* of the suspect, which, unlike the *still photos* in *Perry* and *Mixon*, allowed the witness to "observe such distinguishing characteristics as [the] defendant's posture, gait and body movements"; and "jurors were able to test the [witness's] opinion . . . because they saw still photos taken from some of the videos and they could test his ability to correctly identify [the] defendant in . . . three videos they were shown"]; *People v. Son* (2020) 56 Cal.App.5th 689, 697 [finding no error in the admission of a detective's testimony narrating events depicted in surveillance footage because she "testified she watched the video at least 50 times and that subsequent viewings revealed details she had not picked up on at first," which was "helpful" to the jury by "speed[ing] up the process of teasing out obscure details in the video"]; *People v. Phillips* (2022) 75 Cal.App.5th 643, 685 [holding that even if details observed in a video could have been brought to the jury's attention without a police officer's lay opinion regarding what the details depicted, the opinion was helpful where "the significance of the [details] to the investigation would not have been evident" and the opinion "provided connections between . . . items of evidence"].)

We need not determine where along this admissibility continuum Detective Paulino's testimony falls because we conclude that even if he lacked an adequate foundation to identify Pressley in the AM/PM surveillance footage, any error in the admission of this testimony was harmless.

First, DNA evidence convincingly tied Pressley to the revolver recovered in the van. Although Pressley argued that Deputy Balos contaminated the reference sample, the DNA analyst refuted that theory by confirming that the reference sample contained only a single DNA profile that certainly would have come from swabbing Pressley's cheek and not from

13

the deputy's ungloved hand briefly touching the collection swab.  The fact the jury convicted Pressley on the firearm and ammunition charges and not on the resisting arrest charge suggests the jury found the DNA evidence compelling because the evidence related to the former charges but not the latter.  Additionally, despite the Attorney General citing the strength of the DNA evidence as a basis for finding any error harmless, Pressley did not contest the claim in his reply brief.

Second, Deputy Balos testified that the person he saw — firsthand — fleeing from him was Pressley.  We have concluded that this evidence was properly admitted.

Third, the "jurors were able to test [Detective Paulino]'s opinion" because they saw Pressley's DMV photo, the body-worn camera footage documenting four prior encounters with Pressley, and the AM/PM surveillance footage.  (*Larkins*, *supra*, 199 Cal.App.4th at p. 1068; see *Leon*, *supra*, 61 Cal.4th at p. 601 ["because the surveillance video was played for the jury, jurors could make up their own minds about whether the person shown was defendant"].)  Indeed, this is partly the relief Pressley requested in his motion in limine:  "Let the jury look at the same evidence that Detective Paulino looked at . . . and . . . reach their own conclusions."

The jury also saw photos and video of Russell, which constitute substantial evidence because the thrust of Pressley's identity defense was that Russell — the registered owner of the van who shared an address with Pressley — was the perpetrator, not Pressley.  Thus, the prosecution primarily needed to distinguish Pressley from Russell, not Pressley from every other possible suspect.  We have seen the photographic and video evidence and are satisfied that the differences between Pressley and Russell in height (about five inches), weight (37 pounds), build (thin versus medium),

14

gait (Russell walks with a limp and Pressley does not), and hairstyle (Pressley has shoulder-length braids or dreadlocks whereas Russell has short hair) satisfactorily confirm that the AM/PM surveillance video shows Pressley and not Russell.

Finally, the trial court instructed the jury regarding the evaluation of lay witness opinion testimony (see CALCRIM No. 333) and factors to consider in evaluating eyewitness identification testimony (see CALCRIM No. 315). We presume the jury followed these instructions. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 83.)

Pressley maintains the error was prejudicial because Detective Paulino's conclusion that Pressley is the person depicted in the AM/PM surveillance footage, implied the detective "had extra-judicial evidence that [he] relied upon — which the jury did not receive as evidence." Specifically, Pressley argues the detective "testified, after stating he relied on body-worn camera videos from August 30, 2022, and August 16, 2023 . . . , that there were a couple of other incidents that he reviewed." Pressley reasons that "this reference to evidence not presented or described to the jury . . . would lead to a reasonable inference that as a detective, he is privy to evidence not submitted to the jury, so the jury should defer to his opinion." (See, e.g., *People v. Rouston* (2024) 99 Cal.App.5th 997, 1012 (*Rouston*) ["Given [the prosecution witness]'s status as a gang expert, the designated investigator who testified repeatedly throughout the trial, and a detective, 'the jury had every reason to look to [him] as a far better judge than they could be' regarding the reliability of other witnesses' testimony, and what inferences to draw from the prosecution's other evidence."].) We are not persuaded.

In addition to the two body-worn camera videos that Detective Paulino specifically cited, the trial court admitted as evidence two other body-worn

15

camera videos depicting Pressley (November 22, 2022, and May 20, 2023). The jury would most likely have concluded that these were the other incidents Detective Paulino was referring to. Additionally, although we are mindful of the weight a jury may place on the testimony of an extensively involved detective (see *Rouston, supra*, 99 Cal.App.5th at p. 1012), that risk was mitigated here because Detective Paulino testified to the limited nature of his involvement in the case.

Accordingly, we conclude that any assumed error in admitting Detective Paulino's testimony that Pressley is the person depicted in the AM/PM surveillance footage was harmless and did not deprive Pressley of a fair trial.

## B. *Griffin* Error Occurred but Was Harmless

Pressley contends the prosecutor committed *Griffin* error during voir dire when she followed up on defense counsel's questioning of prospective jurors about Pressley's likely decision not to testify at trial. We agree *Griffin* error occurred but conclude it was harmless.

### 1. Background

During voir dire, defense counsel explained that "the right to remain silent . . . doesn't just start with police contact," but "goes all the way through trial." After advising that it was "pretty likely" that Pressley would not testify at trial, defense counsel asked whether any jurors were "going to think [he] has got something to hide simply because he doesn't testify" or thought they would "need[] to hear both sides of the story." Three prospective jurors stated they would want to hear Pressley testify. Counsel concluded her questioning of the jurors by emphasizing, "He's innocent right now and he's innocent even if he doesn't say a peep."

16

The prosecutor then questioned the jurors about a variety of topics before addressing two of the jurors that defense counsel questioned about Pressley not testifying. The prosecutor asked, "I know that you guys said you would like to hear from the defense, but . . . would you understand if someone accused of a crime fearing cross-examination by myself . . . doesn't want to take the stand?" Defense counsel objected, citing *Griffin*. The trial court sustained the objection. The prosecutor resumed, "At the end of the trial, can you hold me to my burden that the evidence that I bring proves the case beyond a reasonable doubt without any statement from the defense?" The two jurors agreed they would hold the prosecutor to her burden.

During a sidebar conference a few minutes later, defense counsel asked for a new jury panel based on the sustained objection. The court denied the request but invited the prosecutor to make a record for her question. The prosecutor explained that her "question was very similar to [defense counsel's] line of questioning" and was "trying to reinforce the point that the burden is always on [the prosecutor] and that [the defendant] doesn't need to testify." Defense counsel responded that the prosecutor's reference to Pressley "fearing cross-examination was the big issue" because it implied "he must have done something wrong." The trial court reiterated its denial of the defense request for a new jury panel, reasoning the prosecutor's question was not "prejudicial to the point where a new panel needs to be called up."

Later, outside the jury's presence, the trial court clarified at the prosecutor's request that while the court had found the prosecutor's question was "improper," it was not *Griffin* error.

## 2. Relevant Legal Principles

" 'Under the Fifth Amendment of the federal Constitution, a prosecutor is prohibited from commenting directly or indirectly on an accused's

17

invocation of the constitutional right to silence.' " (*People v. Tafoya* (2007) 42 Cal.4th 147, 184; see *Griffin, supra,* 380 U.S. at p. 615 ["We . . . hold that the Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." (Fn. omitted.)].)

*Griffin* error is subject to the harmless error test set forth in *Chapman v. California* (1967) 386 U.S. 18, which requires reversal unless we conclude the error was harmless beyond a reasonable doubt. (*People v. Thompson* (2016) 1 Cal.5th 1043, 1118 & fn. 14 (*Thompson*).) " ' " '[I]ndirect, brief and mild references to a defendant's failure to testify, without any suggestion that an inference of guilt be drawn therefrom, are uniformly held to constitute harmless error.' " ' " (*Id.* at p. 1118.)

### 3. Analysis

We conclude the prosecutor's question constituted *Griffin* error. The question expressly referenced a defendant's decision not to testify. And the reference to "fearing cross-examination" can reasonably be construed as implying the defendant may have something to hide. Indeed, although the Attorney General does not expressly concede error, he "agrees that the prosecutor's voir dire question was perhaps imprudent because it could be interpreted — inadvertently — as communicating to the jury that it could consider [Pressley's] silence as evidence of his guilt." This is precisely the inference *Griffin* prohibits. (See *Griffin, supra,* 380 U.S. at p. 615; see *People v. Boyette* (2002) 29 Cal.4th 381, 454 [finding the prosecutor's comment — " 'if he were to . . . take the stand and say he was sorry, which you didn't see' " — constituted *Griffin* error because "it clearly refers to [the] defendant's failure to take the stand"].) Accordingly, we conclude the prosecutor's question was error under *Griffin*.

Having found error, we nonetheless find it harmless beyond a reasonable doubt.  We find *People v. Fierro* (1991) 1 Cal.4th 173 (*Fierro*) instructive.  In *Fierro*, defense counsel "emphasiz[ed]" during voir dire that the "defendant's silence could not be used against him, . . . observ[ing] that there might be plausible reasons why [the] defendant, although innocent, would choose not to take the witness stand."  (*Id.* at p. 208.)  "Later, the prosecutor also stated that [the] defendant had a right to remain silent and explained, 'you can't hold that against the defendant.  You can't consider that.'  Recalling defense counsel's remark as to why an *innocent* person might not testify, the prosecutor further observed that 'there might be reasons why a *guilty* man doesn't want to take the stand also and testify.'  However, he then repeated his admonishment not to 'even think about this . . . .  It would be totally inappropriate for you to think about . . . this and try to guess about why somebody does [not testify].' " (*Ibid.*, italics added.)  The trial court denied defense counsel's request for an admonition regarding the defendant's right to remain silent, "explaining that it had already admonished each juror on the burden of proof and [the] defendant's right not to testify."  (*Ibid.*)

The *Fierro* court found no prejudicial error.  (*Fierro*, *supra*, 1 Cal.4th at pp. 208–209.)  Although the court found "it may have been ill-considered to state that a guilty person may have reasons not to testify just as an innocent person might," the court did "not believe the prosecutor's statement could reasonably have been construed as urging the jury to consider defendant's silence as evidence of guilt.  Indeed, . . . the prosecutor followed this remark with a further admonition not to consider the matter."  (*Ibid.*)  "Accordingly," the *Fierro* court "discern[ed] no possibility that the statement subjected [the] defendant to prejudice."  (*Id.* at p. 209.)

Here, too, it was "ill-considered" for the prosecutor to imply Pressley would likely not testify because he feared cross-examination.  But, as in *Fierro*, the prosecutor promptly clarified that the jury should not draw an improper inference from the comment.  (*Fierro*, *supra*, 1 Cal.4th at p. 208.)  Specifically, immediately after the trial court sustained the defense objection, the prosecutor admonished jurors to "hold [her] to [her] burden" of proving her case "beyond a reasonable doubt" even "without any statement from the defense."  Further, as the prosecutor explained during the sidebar conference, the question was couched in terms of "understand[ing]" a defendant's decision not to testify rather than implying it evidenced guilt.

The trial court's instructions to the jury further dispel any concerns about prejudice.  Defense counsel did not request a curative instruction after the court sustained the objection, and the court's predeliberation charge to jurors expressly instructed them regarding the presumption of innocence (see CALCRIM No. 220) and a defendant's absolute right not to testify (see CALCRIM No. 355).[6]  (See *Thompson*, *supra*, 1 Cal.5th at p. 1118 [finding *Griffin* error harmless where "the trial court's comment [to defense counsel, " '*You are resting without calling your client?*' "] consisted of just a single short query," "did not directly suggest the jury should draw an inference of guilt from [the] defendant's decision not to testify," and "the jury was instructed that '[a] defendant in a criminal trial has a constitutional right not

---

6      As given, CALCRIM No. 355 states:  "A defendant has an absolute constitutional right not to testify.  He or she may rely on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt.  Do not consider, for any reason at all, the fact that the defendant did not testify.  Do not discuss that fact during your deliberations or let it influence your decision in any way."

to be compelled to testify' " and to " 'not draw any inference from the fact a defendant does not testify' "].)

## C.  No Cumulative Error

Although we have assumed evidentiary error as to Detective Paulino's lay opinion testimony and found *Griffin* error as to the prosecutor's comment during voir dire, we have found each error harmless.  Pressley maintains the cumulative effect of these errors warrants reversal.  We disagree.  "Although a defendant is entitled to a fair trial, he or she is not entitled to 'a perfect one.' " (*People v. Capers* (2019) 7 Cal.5th 989, 1017.)  Based on our review of the appellate record, we are satisfied that Pressley received a fair trial.

## IV.  DISPOSITION

The judgment is affirmed.

RUBIN, J.

WE CONCUR:


IRION, Acting P. J.


DATO, J.

21